Filed 4/11/23  Barraza v. Tesla CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JESSICA BARRAZA,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TESLA, INC.,<br><br>    Defendant and Appellant. | A165347<br><br>(Alameda County<br>Super. Ct. No. 21CV002714) |

After appellant Tesla, Inc., offered respondent Jessica Barraza a job, company representatives asked her when she would give notice to her then-current employer, and they gave her a start date at Tesla.  The company then had her sign a series of documents, none of which included an arbitration clause.  Around a month after Barraza quit her job, and one day after the original start date, Tesla for the first time presented Barraza with a formal offer letter that included an arbitration agreement.  Later, Barraza sued for sexual harassment at the company, and Tesla moved to compel arbitration. The trial court denied the motion.  Because we agree with the trial court that the arbitration provisions in Barraza's offer letter were procedurally and substantively unconscionable, and because we also agree that the trial court acted properly in declining to sever these terms, we affirm.

1

# I.
## FACTUAL AND PROCEDURAL
### BACKGROUND

Barraza has a high-school diploma and is the mother of two children. In late July 2018,[1] she was working as a sales associate at a home décor store where she earned around $10 or $12 per hour. On July 31, she applied for a job at Tesla. Tesla invited Barraza to an "on-site assessment" test on August 15. Before she attended, though, Tesla asked her to sign two documents, an "Applicant Non-Disclosure Agreement" and a "Visitor Safety & Non-Disclosure Agreement," both of which she signed. Neither one contains an arbitration provision and instead they contemplate that disputes covered by the agreements would be litigated in state or federal court.

Barraza visited Tesla again on August 23 for an interview. According to Barraza, she received a verbal offer for a position on Tesla's assembly line paying $19 per hour, which she accepted. That there was a job offer and acceptance was evidenced by a notation in Tesla's human-resources system stating "Selected at Sup Interview on 08/23. Accepted/verbal Offer." The interviewer told Barraza that Tesla would contact her about orientation dates.

Over the following nearly two months, Tesla sent Barraza a series of communications and documents related to starting work. On September 19, a Tesla recruiting employee emailed Barraza stating that she (Barraza) had "completed all pre-employment steps" for her new role, and that Tesla was "excited to move [Barraza] on to the next round of the process." The email provided three options as to when Barraza could start work: as soon as possible (October 1), if she did not need to provide notice to her current

---

[1] All further date references are to the 2018 calendar year unless otherwise specified.

employer; October 8, if she needed to give two weeks' notice to her employer; or another later date if she needed to provide more notice to her employer. (The email also stated that Barraza's start date was "***tentative*** based on business needs.") Barraza replied that she would give her current employer two weeks' notice the following day and could begin at Tesla on October 8. Barraza promptly gave notice to her employer, and once she did she could not afford to turn down the job at Tesla because she needed to earn money to pay her bills and support her two children. Tesla informed Barraza on September 25 that her start date would be October 15, but the date was later pushed back to October 22.

On October 1, Barraza received an email with the subject line "Welcome to Tesla, Jessica!" The email stated, "Congratulations, Jessica! [¶] We are very excited to have you as a member of our Tesla team where you will help accelerate the shift towards sustainable transportation and energy consumption." It included information about an orientation date and Tesla's benefits package. The email also included instructions on how to log into Tesla's human-resources management system to complete required "[o]nboarding tasks." Barraza electronically signed six onboarding documents on October 9. One of them was titled the "Tesla, Inc. Employee Non-Disclosure and Inventions Assignment Agreement" and is referred to by the parties as the "PIIA" (for Proprietary Information and Inventions Agreement). The PIIA is a four-page form document that requires Barraza to hold all of Tesla's proprietary information in the strictest confidence (with the exception of any disclosed prior inventions, which Barraza did not indicate she had). A section of the document titled "**LEGAL AND EQUITABLE REMEDIES**" states, "I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm and that the

3

Company shall therefore have the right to enforce this Agreement and any of its provisions by injunction, specific performance, or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement." The document further provided that Barraza agreed to submit to jurisdiction to enforce the agreement "in the state and federal courts located in the county and state in which you are primarily assigned to work in by [Tesla]." Barraza's understanding was that she had to sign the PIIA and other onboarding documents in order to work at Tesla, and no one ever suggested to her (nor has Tesla suggested in this litigation) that she had the option of negotiating any of the documents' terms.

On October 16, Tesla emailed Barraza a link to an employment-offer letter that included the arbitration agreement that is the subject of this appeal. The subject line of the email states, "Please sign your Offer!" The email provides, "Congratulations Jessica, [¶] It is our pleasure to formally offer you the position of Production Associate, General Assembly Model 3 at Tesla. Please take a moment to review the attached offer letter which includes your proposed title, manager, compensation information, and start date. We look forward to your confirmation and acceptance of this offer." The letter attached to Barraza's offer letter is just over three pages long. It sets forth her pay rate ($19 per hour); her entitlement to health and dental benefits, as well as to paid time off; and the process to vest in Tesla stock. We sometimes refer to this document as the formal offer letter.

The formal offer letter first mentions arbitration around a page and a half into the letter and states that "to ensure the rapid and economical resolution of disputes that may arise in connection with your employment with Tesla, you and Tesla agree that any and all disputes, claims, or causes

4

of action, in law or equity, arising from or relating to your employment, or the termination of your employment, will be resolved, to the fullest extent permitted by law by final, binding and confidential arbitration in your city and state of employment conducted by the Judicial Arbitration and Mediation Services/Endispute, Inc. ('JAMS'), or its successors, under the then current rules of JAMS for employment disputes." The offer letter further provides that (1) any action must be brought in a party's individual capacity, and not as a member of any class proceeding, (2) the arbitrator would "have the authority to compel adequate discovery for the resolution of the dispute and to award such relief as would otherwise be permitted by law," (3) the arbitrator would not have the authority to consolidate any claims or to award relief to a group or class of employees, (4) the arbitrator shall issue a written decision that includes the arbitrator's essential findings and conclusions as well as a statement of the award, (5) both the employee and Tesla "shall be entitled to all rights and remedies that you or Tesla would be entitled to pursue in a court of law," and (6) Tesla shall pay "all fees in excess of those which would be required if the dispute was decided in a court of law."

Not all claims are subject to arbitration under the agreement. The agreement provides that nothing "is intended to prevent either you or Tesla from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any such arbitration. Notwithstanding the foregoing, you and Tesla each have the right to resolve any issue or dispute arising under the Proprietary Information and Inventions Agreement [a reference to the PIIA] by Court action instead of arbitration."

The arbitration agreement does not include or restrict "administrative claims [Barraza] may bring before any government agency where, as a matter of law, the parties may not restrict your ability to file such claims

5

(including discrimination and/or retaliation claims filed with the Equal Employment Opportunity Commission and unfair labor practice charges filed with the National Labor Relations Board)." Otherwise, though, "it is agreed that arbitration shall be the exclusive remedy for administrative claims."

Finally, the offer letter contains a severability clause, which provides that "[i]f one or more of the provisions in this arbitration agreement, or any portion thereof, are deemed invalid, unenforceable, or void under the Federal Arbitration Act or other applicable law, then the remaining provisions, or portions thereof, shall not thereby be affected and will continue in full force and effect, and shall be given full effect without regard to the invalid, unenforceable, or void provision, or portion thereof."

The formal offer letter sets Barraza's start date as October 22. It concludes by stating that if Barraza accepts the offer, she should so indicate by signing the letter and returning it to Tesla before October 18, at which point it would expire. According to Tesla's electronic records, Barraza clicked on a link to the offer letter, which she signed on October 17 using an "e-signature" created using Tesla's applicant-tracking software system. At the time Barraza signed the offer letter, she did not know what arbitration was or even how to pronounce the word.

Barraza started working as a production associate at Tesla on October 22. According to Barraza's complaint, over the following three years she was subject to near daily sexual harassment on Tesla's factory floor that was known to, and sometimes perpetrated by, supervisors and managers, and complaints to human resources were ineffective.

Barraza sued Tesla in November 2021. As amended, her complaint alleged that Tesla violated the California Fair Employment and Housing Act (FEHA, Gov. Code, § 12900 et seq.) because of (1) sexual harassment (*id.*,

6

§ 12940, subd. (j)), (2) failure to prevent sexual harassment (*id.*, § 12940, subd. (k)), and retaliation (*id.*, § 12940, subd. (h)). She also brought the action as a representative action under the Labor Code Private Attorney General Act of 2004 (PAGA, Lab. Code, § 2698 et seq.). She sought civil penalties on behalf of herself and other female Tesla employees at its Fremont factory for the company's creation of an unsafe work environment. And she sought a declaration that the arbitration agreement was procedurally and substantively unconscionable and thus unenforceable (Code Civ. Proc., § 1060).

Tesla filed a motion to compel arbitration of all of Barraza's non-PAGA claims. Barraza opposed the motion and argued that the arbitration agreement was procedurally and substantively unconscionable and thus unenforceable.

A hearing on the motion was held on the same day that the U.S. Supreme Court held oral argument in *Viking River Cruises, Inc. v. Moriana* (2022) __ U.S. __ [142 S.Ct. 1906] (*Viking River*), regarding the arbitrability of PAGA claims.

The trial court denied the motion to compel. It concluded that the timetable of Barraza's application for employment established a high level of procedural unconscionability. This was based on the fact she had quit her previous job after being reasonably led to believe that she had been hired by Tesla, and signed several documents to that effect, before she was presented with the formal offer letter to sign. The court also concluded that the agreement contained substantive unconscionability for reasons discussed in more detail below. The court declined to sever unconscionable provisions so that arbitration could proceed.

## II.

### DISCUSSION

*A. General Principles and the Standard of Review.*

The Federal Arbitration Act (FAA, 9 U.S.C. § 1 et seq.) provides that a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) The FAA expresses favor for arbitration agreements. (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 235 (*Pinnacle*).) "In determining the rights of parties to enforce an arbitration agreement within the FAA's scope, courts apply state contract law while giving due regard to the federal policy favoring arbitration." (*Id.* at p. 236.)

The FAA was recently amended, and if Barraza had sued Tesla after the amendment, her claims for sexual harassment would not be subject to arbitration. In March 2022, the President signed the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (9 U.S.C. §§ 401, 402), which voids predispute arbitration clauses in cases involving allegations of sexual harassment. (See *Murrey v. Superior Court* 87 Cal.App.5th 1223 (*Murrey*).) The amendment, however, does not apply in this case because it is applicable only to lawsuits filed after its enactment. (*Id.* at p. 1235.) Thus, the pre-amendment law governing the FAA applies.

"The party seeking arbitration bears the burden of proving the existence of an arbitration agreement, and the party opposing arbitration bears the burden of proving any defense, such as unconscionability." (*Pinnacle, supra*, 55 Cal.4th at p. 236.) Barraza does not dispute the existence of an agreement between her and Tesla, but she contends that the arbitration provision is unconscionable. "The general principles of unconscionability are well established. A contract is unconscionable if one of

8

the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party. [Citation.] Under this standard, the unconscionability doctrine ' "has both a procedural and a substantive element." ' [Citation.] 'The procedural element addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power. [Citations.] Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided.' " (*OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125.) Both procedural and substantive unconscionability must be shown to establish the defense. (*Ibid.*)

The doctrine of unconscionability ensures that contracts, particularly those of adhesion, do not impose terms that are overly harsh, unduly oppressive, or are so one-sided as to shock the conscience. (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 910 (*Sanchez*).) It does not, however, encompass a simple bad bargain. (*Id.* at p. 911.) "An evaluation of unconscionability is highly dependent on context." (*Ibid.*) "The doctrine often requires inquiry into the 'commercial setting, purpose, and effect' of the contract or contract provision." (*Ibid.*) "[T]he substantive unfairness of the terms must be considered in light of any procedural unconscionability. The ultimate issue in every case is whether the terms of the contract are sufficiently unfair, in view of all relevant circumstances, that a court should withhold enforcement." (*Id.* at p. 912.)

"Where, as here, the evidence is not in conflict, we review the trial court's denial of arbitration de novo." (*Pinnacle, supra,* 55 Cal.4th at p. 236.)

9

*B. The Arbitration Provision Is Procedurally Unconscionable.*

Tesla first argues that the formal offer letter was not procedurally unconscionable, but we are not persuaded.

"A procedural unconscionability analysis 'begins with an inquiry into whether the contract is one of adhesion.' [Citation.] An adhesive contract is standardized, generally on a preprinted form, and offered by the party with superior bargaining power 'on a take-it-or-leave-it basis.' " (*OTO, L.L.C. v. Kho, supra*, 8 Cal.5th at p. 126.) There appears to be no real dispute here that Tesla had far superior bargaining power and that Barraza's formal offer letter containing the arbitration provisions was a contract of adhesion. The question, therefore, is "whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required." (*Ibid.*) " ' " '*Oppression* occurs where a contract involves lack of negotiation and meaningful choice, *surprise* where the allegedly unconscionable provision is hidden within a prolix printed form.' " ' " (*Ibid.*)

Where a party has no ability to individually negotiate a contract's terms, could not opt out of an arbitration provision, and thus had no meaningful choice but to accept an arbitration provision as drafted by the other party, this establishes at *least* a minimal level of procedural unconscionability. (*Bakersfield College v. California Community College Athletic Assn.* (2019) 41 Cal.App.5th 753, 762–763.) We agree with the trial court that these factors plus the additional facts Barraza established demonstrated a "considerable" level of procedural unconscionability. Barraza quit her previous job after Tesla led her to believe she had secured a job, and after she signed several documents that gave no indication she was agreeing to arbitration, and if anything, suggested that disputes would be resolved in court. As the trial court put it, "Tesla either orchestrated this sequence of

10

events on purpose or was unacceptably indifferent to the situation in which this placed Barraza. Basically, Barraza was ambushed." This conclusion goes to the "oppression" aspect of procedural unconscionability. (*OTO, L.L.C. v. Kho, supra*, 8 Cal.5th at pp. 126–127 [one circumstance relevant to establishing oppression is "the amount and type of pressure exerted on the party to sign the proposed contract"].)

Tesla acknowledges on appeal that when "arbitration is a condition of employment, there is inherently economic pressure on the employee to accept arbitration," which "alone is a fairly low level of procedural unconscionability." (*Alvarez v. Altamed Health Services Corp.* (2021) 60 Cal.App.5th 572, 591.) The company argues, though, that there is nothing inherently unfair about arbitration agreements or including one in an employment contract. (E.g., *Serafin v. Balco Properties Ltd., LLC* (2015) 235 Cal.App.4th 165, 179; *Lagatree v. Luce, Forward, Hamilton & Scripps* (1999) 74 Cal.App.4th 1105, 1124.) In doing so, it focuses narrowly on the circumstances surrounding the formal offer letter but not the events leading up to it.

Tesla notes that the email to Barraza attaching the formal offer letter did not provide any deadline for signing and in fact offered to answer any questions, and Tesla insists that it "did not exert any pressure on Barraza to sign the contract." But at that point, Barraza already had quit her previous job after Tesla specifically asked how much notice she would have to provide to that previous employer. Tesla claims that there was no "sense of urgency" in its October 16 email, which may have been true as far as the company was concerned. But from Barraza's point of view, the email arrived a day after she was originally told she would start at Tesla, and nearly a month after she told Tesla she would provide two weeks' notice to her previous employer.

11

Regardless of the substance or tone of the email forwarding the formal offer, the reality was that Barraza had essentially no choice but to sign the letter in order to secure a job and continue to support her family.

Tesla contends it is "not to blame . . . for Barraza's decision to quit her home décor store job without knowing what the terms of employment for the next job would be." But the contention is at least partially disingenuous, since Tesla had previously specifically asked how much notice Barraza had to provide. The company stresses that at the time Barraza quit there were several other terms of employment (besides the arbitration agreement) unknown to her. But a closer look at these terms reveals they either were actually known to Barraza or were of far less importance than the dispute-resolution procedures.[2] Tesla contends Barraza did not know what her "title" would be when she quit her former job. Barraza attested that she attended an onsite interview for "a position on the assembly line," where she ultimately worked. She worked as a "Production Associate," a fairly generic title that would not likely affect a decision to take a different job. Tesla also says Barraza did not know at the time she quit her what her hourly wage at Tesla would be, but that is not quite true. She attested she "believe[d she] was told that the pay was $19 per hour," which is what her rate turned out to be. Tesla further notes that Barraza did not know what her start date would be, but again this is at least somewhat disingenuous given that Tesla provided different start dates that depended on how soon Barraza could give

_____

[2] At oral argument, Tesla reiterated its argument that arbitration terms cannot be disfavored over other contract terms. For purposes of this appeal, we assume, without deciding, that the standards for reviewing agreements to arbitrate employment sexual-harassment claims in cases filed before the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 were unaffected by the Act and the policies it reflects.

notice. And while it is true, as Tesla contends, that Barraza did not know when she quit her previous job "whether she would receive a recommended equity grant," this is hardly a standard benefit that would necessarily weigh on a potential non-exempt employee's decision to quit a job for one that pays more. We thus reject Tesla's argument that the trial court "single[d] out arbitration for disfavored treatment," since this was a major term that was effectively hidden from Barraza until after she was initially told she would start work at Tesla. As Barraza puts it, unlike the other terms Tesla lists on appeal, "[i]t was the unappealing, unfavorable non-mutual arbitration provision that Tesla withheld until it was too late."

We agree with Tesla insofar as it claims that that the "surprise" element of procedural unconscionability was missing here, since the arbitration provisions were not hidden in the formal offer letter or otherwise difficult to read. (Cf. *OTO, L.L.C. v. Kho*, *supra*, 8 Cal.5th at pp. 126, 128.) But where, as here, " 'an adhesive contract is oppressive, surprise need not be shown.' " (*Nyulassy v. Lockheed Martin Corp.* (2004) 120 Cal.App.4th 1267, 1281.)

### C. The Arbitration Provisions Are Substantively Unconscionable.

We next conclude, as did the trial court, that the arbitration provisions of the formal offer letter were substantively unconscionable.

"Substantive unconscionability pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly harsh or one-sided. [Citations.] A contract term is not substantively unconscionable when it merely gives one side a greater benefit; rather, the term must be 'so one-sided as to "shock the conscience." ' " (*Pinnacle*, *supra*, 55 Cal.4th at p. 246.)

13

The trial court acknowledged that the formal offer letter's arbitration agreement appeared in some ways to have been drafted to meet the requirements in the employment context, as set forth in *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83 (*Armendariz*): It was "nominally mutual," it provided for adequate discovery, specified the applicable rules, set an appropriate venue, called for a written decision, did not limit remedies, and stated that Tesla would pay any costs of litigation that exceeded what Barraza would otherwise incur in court. The trial court nonetheless found three elements of substantive unconscionability: (1) lack of mutuality, (2) complete confidentiality, and (3) a ban on representative actions. We separately address these factors.

1. The Formal Offer Letter Lacked Mutuality.

As we have said, the formal offer letter stated that notwithstanding the arbitration provisions, Barraza and Tesla each had the right to resolve any dispute under the PIIA "by Court action instead of arbitration." The trial court agreed with Barraza that "Tesla ha[d] reserved its right to go to court for the claims it is likely to have and has relegated Barraza to arbitration for her likely claims." The court concluded that Tesla had failed to justify the wholesale exclusion of PIIA claims from arbitration and that the agreement was therefore substantively unconscionable in part for lack of mutuality. (See *Farrar v. Direct Commerce, Inc.* (2017) 9 Cal.App.5th 1257, 1273 [substantive unconscionability present where contract had carve-out for confidentiality agreement that was not limited to provisional judicial remedies].)

On appeal, Tesla first argues that the formal offer letter was not non-mutual since a hypothetical employee who signed the PIIA could sue Tesla for patent infringement or misappropriation of trade secrets if that employee

14

listed any prior inventions to exclude from the scope of the agreement. But the likelihood that a prospective factory worker would list such an invention appears low, and in any event Barraza listed none.

Tesla next directs the court to the portion of *Armendariz* that held that not "all lack of mutuality in a contract of adhesion was invalid" and that " 'a contract can provide a "margin of safety" that provides the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need without being unconscionable.' " (*Armendariz, supra,* 24 Cal.4th at p. 117.) But this principle does not assist Tesla. *Armendariz* relied on *Stirlen v. Supercuts, Inc.* (1997) 51 Cal.App.4th 1519, which analyzed an employment agreement that contemplated court action for various confidentiality and trade-secrets issues but binding arbitration for employment issues. (*Id.* at pp. 1528–1529.) The court acknowledged that a contract may provide a margin of safety for legitimate needs but stressed that "unless the 'business realities' that create the special need for such an advantage are explained in the contract itself, . . . it must be factually established." (*Id.* at p. 1536.) Because no such reasons were set forth in the contract and had not been established by the party seeking arbitration, Division Two of this court concluded that those factors weighed in favor of substantive unconscionability. (*Id.* at pp. 1536–1537, 1542.) *Armendariz* likewise concluded that "it is unfairly one-sided for an employer with superior bargaining power to impose arbitration on the employee as plaintiff but not to accept such limitations when it seeks to prosecute a claim against the employee, without at least some reasonable justification for such one-sidedness based on 'business realities.' " (*Armendariz, supra,* at p. 117.) And it found the agreement at issue in that case to contain "unconscionable one-sidedness." (*Id.* at p. 121; see also *Murrey, supra,* 87 Cal.App.5th at

15

pp. 1251–1252 [where intellectual property claims excluded from arbitration, lack of mutuality "add[ed] to th[e] agreement's substantive unconscionability"].)

The trial court here concluded that Tesla presented "no factual showing of business reasons justifying the wholesale exemption of PIIA claims and other NDA claims from the arbitration agreement." Tesla claims the PIIA itself provides such justification because it states that Barraza acknowledges that any violation of the agreement "may cause [Tesla] irreparable harm." It argues that the PIIA is thus comparable to the agreement in *Baltazar v. Forever 21, Inc.* (2016) 62 Cal.4th 1237, but we are not persuaded. In *Baltazar*, the parties agreed that if a claim went to arbitration, the parties were authorized to seek preliminary injunctive relief. (*Id.* at p. 1241.) Our Supreme Court concluded that this clause simply restated existing law that a party to an arbitration agreement may seek provisional remedies (Code Civ. Proc., § 1281.8, subd. (b)), and thus the agreement was not unconscionable. (*Baltazar*, at p. 1241.) This conclusion did not rest on the fact that the parties' agreement specified that the company had valuable trade secrets and confidential information, as Tesla claims. (*Id.* at pp. 1241, 1250.) Tesla does not address the point that here the PIIA is not limited to provisional remedies already contemplated by statute.

Nor did Tesla provide a legitimate commercial need for the PIIA's statement that because a violation of the agreement may cause Tesla irreparable harm, the company "shall therefore have the right to enforce this Agreement and any of its provisions by injunction, specific performance, or other equitable relief, *without bond* and without prejudice to any other rights and remedies that the Company may have." (Italics added.) Because such a provision authorizes the stronger party to obtain injunctive relief without

16

having to establish all the essential elements for the issuance of an injunction, it is substantively unconscionable. (*Lange v. Monster Energy Co.* (2020) 46 Cal.App.5th 436, 451 [unconscionable to waive requirements that bond be posted]; *Carbajal v. CWPSC, Inc.* (2016) 245 Cal.App.4th 227, 250 [same].)

We agree with the trial court that the formal offer letter was substantively unconscionable for lack of mutuality.

### 2. The Formal Offer Letter's Confidentiality Provision Is Substantively Unconscionable.

Barraza argued below that the requirement that employment disputes be resolved by "binding and *confidential* arbitration" (italics added) was substantively unconscionable because it "create[d] a barrier" for her to gather evidence since it prohibited her from telling other people she was pursuing claims of sexual harassment. When questioned by the trial court repeatedly at the hearing on Tesla's motion what the term "confidential arbitration" meant, Tesla's counsel responded that arbitration hearings were generally confidential, that the term would be interpreted by the arbitrator pursuant to JAMS rules, and that Tesla had not taken any steps to prevent Barraza from engaging in informal discovery. Barraza's attorney responded that the term was ambiguous, which added to its unconscionability, and that JAMS rules provide only that the arbitrator is required to keep arbitration confidential

17

but do not provide further guidance on whether the *parties* were required to do so.[3]

The trial court concluded that "[t]he simple provision for a 'confidential arbitration' without any qualification" was as broad as clauses struck down by other courts, including this court in *Ramos v. Superior Court* (2018) 28 Cal.App.5th 1042, 1067 (*Ramos*). It thus found the confidentiality provision to be substantively unconscionable.

On appeal, Tesla contends that "[t]he most reasonable interpretation of the term 'confidential arbitration' is that only the arbitration *proceedings* themselves are 'confidential,' such that the public may not attend." It argues that the trial court improperly interpreted the term "confidential arbitration" in a "maximally restrictive manner." (E.g., *Pearson Dental Supplies, Inc. v. Superior Court* (2010) 48 Cal.4th 665, 682 [clause stating that parties agreed to arbitration to avoid formal administrative proceedings interpreted by court in a way to render it lawful].) Were this in fact the "most reasonable" way to interpret the term, presumably Tesla would not have waited until its appeal to raise it for the first time. As the trial court observed, "if Tesla meant to limit confidentiality, it could have so provided."

The confidentiality provision is comparable to the one in *Ramos*, *supra*, 28 Cal.App.5th at p. 1065. There, the arbitration provision provided that "all aspects of the arbitration shall be maintained by the parties and the

---

[3] Rule 26 of the JAMS Employment Arbitration Rules & Procedures, effective June 1, 2021, provides that the arbitrator shall maintain the confidentiality of the arbitration proceeding and award except in certain circumstances, the arbitrator may issue orders to protect proprietary or confidential information, and the arbitrator may exclude non-parties from a hearing. The trial court granted Tesla's request that it take judicial notice of the JAMS rules. On its own motion, this court also takes judicial notice of the rules. (Evid. Code, § 459.)

arbitrators in strict confidence." (*Ibid.*) Because the clause required the plaintiff employee to keep all aspects of arbitration secret, this court held, she would violate it if she tried to contact any witness outside of formal discovery. (*Id.* at p. 1066.) Such a limitation would increase the costs of discovery by requiring the plaintiff to conduct depositions instead of informal interviews, which would "defeat[] the purpose of using arbitration as a simpler, more time-effective forum for resolving disputes," and it unreasonably favored the defendant employer to the detriment of employees. (*Ibid.*) For all of these reasons, the court found the clause to be substantively unconscionable. (*Id.* at pp. 1066–1067.) Tesla claims that the confidentiality provision here is distinguishable from the one in *Ramos* because here, the agreement "does not specify that everything about the arbitration shall remain confidential." Again, though, we agree with the trial court that the fact the confidentiality provision here does not include any qualification means it "is effectively just as just as broad as the clause[] struck down in *Ramos*."

Tesla relies on other cases that are inapposite. For example, it cites this court's opinion in *Epstein v. Vision Service Plan* (2020) 56 Cal.App.5th 223. Detailed confidentiality provisions in *Epstein* governed "a confidential, medical peer review process," which was an "entirely different" context from the employment dispute in *Ramos*. (*Epstein* at p. 245.) Tesla also contends that its confidentiality agreement "is much closer to the confidentiality provision" that was found acceptable in *Sanchez v. Carmax Auto Superstores California, LLC* (2014) 224 Cal.App.4th 398, 408. The *Sanchez* court did not directly quote the confidentiality provision at issue but stated that it "require[d] that the arbitration (including the hearing and record of the proceeding) be confidential and not open to the public unless the parties agree otherwise, or as appropriate in any subsequent proceeding between the

19

parties, or as otherwise may be appropriate in response to governmental or legal process." (*Ibid.*) In a single line of analysis, the court concluded that the provision was not substantively unconscionable because it was comparable to a case where the court concluded that the fact that a transcript of an arbitration proceeding was to remain confidential was not substantively unconscionable. (*Ibid.*, quoting *Woodside Homes of Cal., Inc. v. Superior Court* (2003) 107 Cal.App.4th 723, 732, see also *Woodside* at pp. 725, 731.) Again, had Tesla wanted to limit its confidentiality provision to apply only to the arbitration hearing itself, it could have done so. As drafted, the confidentiality provision is unconscionable. Moreover, we agree with *Murrey*, *supra*, 87 Cal.App.5th 1223 , that *Carmax* and *Woodside* are not "persuasive in the context of a workplace sexual harassment complaint." (*Murrey* at p. 1254.)

In *Murrey*, the plaintiff employee signed an agreement stating "she would not 'publish or disseminate' the arbitration award." (*Murrey*, *supra*, 87 Cal.App.5th at pp. 1253–1254.) The court noted that Congress and the President believed that barring arbitration of sexual-harassment claims was "necessary due to growing evidence the secretive nature of arbitration was fostering 'the growth of office cultures that ignore harassment and retaliate against those who report it, prevent future victims from being warned about dangerous companies and individuals, and create incentives for the corporate protection of rapists and other serial harassers.' " (*Id.* at pp. 1254–1255, citing H.R.Rep. No. 117-234, 2d Sess., p. 4 (2022).) Although recent FAA amendments did not apply in *Murrey*, the court found that the confidentiality provision was substantively unconscionable because it "serve[d] no purpose other than to benefit [the employer]. Future employees cannot take advantage of findings in past arbitrations or prove a pattern of

20

discrimination and/or retaliation. . . . In addition, 'keeping past findings secret undermines an employee's confidence in the fairness and honesty of the arbitration process and thus potentially discourages that employee from pursuing a valid discrimination claim.' " (*Id.* at p. 1255.) The same principles are at play here. We likewise conclude that the confidentiality clause in the formal offer letter benefits only Tesla and is substantively unconscionable.

> 3. Our Conclusion That the Arbitration Provisions Are Substantively Unconscionable Does Not Turn on Whether the Ban on Representative Actions May Be Considered Unconscionable.

The trial court last focused on the fact that the formal offer letter bars representative actions, which Barraza argued was unconscionable since an employee's right to bring a PAGA claim is unwaivable under *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 383 (*Iskanian*). The court stated, "At the time the contract was presented, it nominally had Barraza waive a right that the California Supreme Court had held to not be waivable."

Shortly after Tesla appealed, the U.S. Supreme Court issued *Viking River*, *supra*, ___ U.S.___ [142 S.Ct. 1906]. The court distinguished between PAGA actions where an employee is acting as a representative of the state versus PAGA actions where they are based on code violations experienced by other employees. (*Id.* at p. 1916.) Division Five of this court recently summarized *Viking River*'s analysis and holding: "[T]he United States Supreme Court characterized *Iskanian* as adopting two rules: The 'principal rule prohibits waivers of "representative" PAGA claims . . . . That is, it prevents parties from waiving *representative standing* to bring PAGA claims in a judicial or arbitral forum. But *Iskanian* also adopted a secondary rule

21

that invalidates agreements to separately arbitrate or litigate "individual PAGA claims for Labor Code violations that an employee suffered," on the theory that resolving victim-specific claims in separate arbitrations does not serve the deterrent purpose of PAGA." (*Vaughn v. Tesla, Inc.* (2023) 87 Cal.App.5th 208, 234, petn. rev. filed Feb. 14, 2023, S278613, quoting *Viking River, supra,* at pp. 1916–1917.) "*Viking River* held the FAA did *not* preempt *Iskanian* to the extent the decision prohibited waiver of an employee's right to pursue a 'representative' PAGA claim on behalf of the state. [Citation.] That is because 'the FAA does not require courts to enforce contractual waivers of substantive rights and remedies.' " (*Vaughn* at p. 234.) "On the other hand, *Viking River* held *Iskanian* was preempted to the extent it 'invalidates agreements to arbitrate only "individual PAGA claims for Labor Code violations that an employee suffered." ' " (*Ibid.*) *Viking River* held that the arbitration agreement at issue there remained invalid to the extent it was "construed as a wholesale waiver of PAGA claims." (*Viking River* at pp. 1924–1925.) But the Supreme Court further concluded that the plaintiff's representative claim had to be dismissed because she no longer had standing to pursue it, and she was required to arbitrate her individual claims. (*Id.* at p. 1925.)

In a single paragraph in its opening brief, Tesla argues that the formal offer letter's inconsistency with *Iskanian* "ha[s] minimal significance . . . . because an employer may compel an employee to arbitrate her *individual* PAGA claim and, once 'an employee's own dispute is pared away from a PAGA action, the employee is no different from a member of the general public, and PAGA does not allow such persons to maintain suit,' " quoting *Viking River, supra,* 142 S.Ct. at p. 1925. The company does not specifically argue, though, that Barraza somehow lacks standing to represent other Tesla

22

employees. In its reply brief, Tesla acknowledges that the company did not seek to compel arbitration of any part of Barraza's PAGA claims when it filed its motion to compel before the *Viking River* decision.

Barraza argues that *Viking River* does not affect the illegality of the ban on representative actions in this case, since the Supreme Court specifically held that the FAA did not preempt the aspect of *Iskanian* that found wholesale waivers of PAGA claims to be invalid. (*Viking River*, *supra*, 142 S.Ct. at pp. 1924–1925.) The law regarding the arbitration of PAGA claims is currently is flux. Our Supreme Court is currently considering the question of whether an employee who has been compelled to arbitrate PAGA claims that are premised on Labor Code violations actually sustained by that employee maintains statutory standing to pursue PAGA claims arising out of events involving other employees in court or in any other forum the parties agree is suitable. (*Adolph v. Uber Technologies, Inc.* (Apr. 11, 2022, G059860 [nonpub. opn.], rev. granted July 20, 2022, S274671).)

To the extent that a complete ban on representative PAGA actions may still be considered unconscionable, the formal offer letter's ban adds to the agreement's substantive unconscionability. But our conclusion that the formal offer letter is substantively unconscionable does not hinge on whether *Iskanian* still applies. Although both procedural and substantive unconscionability must be present to find an arbitration agreement unenforceable, "they need not be present in the same degree." (*Armendariz*, *supra*, 24 Cal.4th at p. 114.) Courts instead use a sliding scale, such that "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Ibid.*) Here, there was a high level of procedural unconscionability, meaning we need less evidence of substantive

unconscionability to conclude that the arbitration terms were unenforceable. As the trial court put it, "If the 'sliding scale' language in *Armendariz* and other cases is to actually be followed, only a low degree of substantive unconscionability should be required here." We agree and conclude that the agreement's lack of mutuality and its confidentiality clause are sufficient indications of substantive unconscionability to find that the arbitration provisions are unenforceable.

### D. The Trial Court Did Not Abuse Its Discretion When It Declined to Sever Unconscionable Provisions.

Finally, Tesla challenges the trial court's decision not to sever the unconscionable arbitration provisions from the remainder of the formal offer letter and thus allow the case to proceed to arbitration following severance. Tesla contends that the parties are bound by the severance clause of the formal offer letter, which provides, "If one or more of the provisions of this arbitration agreement, or any portion thereof, are deemed invalid, unenforceable, or void under the Federal Arbitration Act or other applicable law, then the remaining provisions, or portions thereof, shall not thereby be affected and will continue in full force and effect, and shall be given full effect without regard to the invalid, unenforceable or void provision, or portion thereof." Tesla's contention that this provision deprived the trial court of its discretion to decline to sever unconscionable provisions is mistaken.

Civil Code section 1670.5, subdivision (a), provides that "[i]f the court as a matter of law finds [a] contract or any clause of the contract to have been unconscionable at the time it was made[,] the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause *as to avoid any unconscionable result*." (Italics added.)

24

" ' "In deciding whether to sever terms rather than to preclude enforcement of the provision altogether, the overarching inquiry is whether the interests of justice would be furthered by severance; the strong preference is to sever *unless* the agreement is 'permeated' by unconscionability." . . . . An agreement to arbitrate is considered "permeated" by unconscionability where it contains more than one unconscionable provision. [Citation.]' " (*De Leon v. Pinnacle Property Management Services, LLC* (2021) 72 Cal.App.5th 476, 492.)

In *Armendariz,* the court stated that Civil Code section 1670.5, subdivision (a) "appears to give a trial court some discretion as to whether to sever or restrict the unconscionable provision or whether to refuse to enforce the entire agreement. But it also appears to contemplate the latter course only when an agreement is 'permeated' by unconscionability." (*Armendariz, supra,* 24 Cal.4th at p. 122.) The court proceeded to analyze "the question of when a trial court *abuses its discretion* by refusing to enforce an entire agreement." (*Ibid.*, italics added.) And it concluded that severance was inappropriate in that case in part because there were "multiple unlawful provisions," meaning "the trial court did not *abuse its discretion* in concluding that the arbitration agreement [was] permeated by an unlawful purpose." (*Id.* at p. 124, italics added.)

Tesla claims that, instead of reviewing the trial court's decision not to sever for an abuse of discretion, we should review de novo the parties' "*contractual* severability agreement." It is true, as we have said, and consistent with cases cited in Tesla's severance analysis, that we review de novo the language of an arbitration clause to determine whether it is unconscionable. (See *Pinnacle, supra,* 55 Cal.4th at p. 236; see also, e.g., *EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1320.) Tesla

25

claims we must rely on the general rule that courts review contract terms de novo in analyzing the severance clause. (E.g., *San Diego Water Authority v. Metropolitan Water Dist. of Southern California* (2017) 12 Cal.App.5th 1124, 1156 [interpreting de novo the terms of an exchange agreement between two water agencies].) This argument ignores the fact that we already have reviewed the formal offer letter de novo and found it to be substantively and procedurally unconscionable. It would hardly make sense to decide the contract was forced on Barraza and thus procedurally unconscionable but then apply the severance clause because, standing alone, the clause is not unconscionable. Doing so would not avoid the unconscionable result of the formal offer letter that we already have concluded exists here. (Cf. Civ. Code, § 1670.5, subd. (a).)

Once again we are persuaded by the analysis in *Murrey*, *supra*, 87 Cal.App.5th 1223. There, as here, the arbitration provisions "contained a high degree of procedural unconscionability. If these provisions had not been challenged in litigation, [Barraza] would have been at a significant disadvantage during arbitration. . . . When we consider the procedural and substantively unconscionable provisions together, they indicate a concerted effort to impose on an employee a forum with distinct advantages for the employer." (*Id.* at p. 1256.) As in *Murrey* and *Armendariz*, we conclude that "the arbitration agreement is permeated by an unlawful purpose." (*Armendariz*, *supra*, 24 Cal.4th at p. 124; *Murrey* at p. 1256.) And as the trial court noted, severance would "mean[] that the lack of mutuality under which Barraza's likely claims would be arbitrated and Tesla's likely claims litigated would never be addressed," since Tesla would still have the benefit of being able to pursue litigation under the PIIA. Tesla's counsel suggested at oral argument that the solution would be to require that Tesla's PIIA claims be

arbitrated. But this proposed solution would require not just severing the PIIA exclusion in the arbitration agreement, but also reforming or voiding the separate PIIA agreement. For all these reasons, we conclude that the trial court did not err in declining to sever the unconscionable provisions.

## III.
### DISPOSITION

The order denying Tesla's motion to compel arbitration is affirmed. Barraza shall recover her costs on appeal.

_____

Humes, P.J.


WE CONCUR:


_____

Banke, J.


_____

Swope, J.*


      *Judge of the Superior Court of the County of San Mateo, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*Barraza v. Tesla*  A165347

28